COOLEY LLP
Steven M. Strauss (99153) (sms@cooley.com)
Erin C. Trenda (277155) (etrenda@cooley.com)
Alexander R. Miller (294474) (amiller@cooley.com)
4401 Eastgate Mall
San Diego, CA 92121
Telephone: (858) 550-6000
Facsimile:  (858) 550-6420

Jeffrey Karr (186372) (jkarr@cooley.com)
3175 Hanover Street
Palo Alto, CA 94304
Telephone: (650) 843-5000
Facsimile: (650) 849-7400

Attorneys for Plaintiff
Javo Beverage Co., Inc.

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAVO BEVERAGE CO., INC., <br><br> Plaintiff, <br><br> v. <br><br> CALIFORNIA EXTRACTION VENTURES, INC. AND STEPHEN COREY, <br><br> Defendants. | Case No.  19-cv-1859 CAB WVG <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF JAVO'S MOTION FOR PRELIMINARY INJUNCTION** <br><br> Date:   December 19, 2019 <br> Ctrm.:  4C (4th Floor) <br> Judge:  Hon. Cathy Ann Bencivengo <br><br> Complaint Filed:  September 26, 2019 <br> Trial Date:        TBD <br><br> PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT |

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

JAVO'S MEM. I/S/O MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. 19-CV-1859 CAB WVG

# TABLE OF CONTENTS

**Page**

I.   Introduction ..................................................................................................... 1

II.  Factual Background ......................................................................................... 3

   A.  Javo is an Industry Leader in Coffee, Tea, and Botanical Extracts with a Proprietary Cold Brew Extraction Process............................................... 3

   B.  Stephen Corey Is a Co-Founder and Former Executive of Javo Who Has Falsely Claimed Javo's Proprietary Processes as His Own. ............................ 5

   C.  CEV Was Co-Founded by Stephen Corey and Kurt Toneys to Compete with Javo. ..................................................................................................... 7

   D.  Corey and CEV's Misappropriation of Javo's Trade Secrets. ................... 9

      1.  Corey and CEV's Patent Filings. ...................................................... 9

      2.  Evidence Suggests that CEV Plans to Use Javo's Intellectual Property for an Imminent Product Launch............................................................ 12

III. Legal Standard .............................................................................................. 13

IV.  Argument ...................................................................................................... 13

   A.  Javo Is Likely to Succeed on the Merits of Its Claims............................. 13

      1.  Javo's Trade Secret Claims Against Corey and CEV....................... 13

      2.  Javo's Patent Ownership Claims and Claim Against CEV for Intentional Interference.................................................................................... 17

      3.  Javo's Claims Are Timely................................................................ 19

   B.  Without Injunctive Relief, Javo Is Likely to Suffer Irreparable Harm. ............. 23

   C.  The Balance of Equities Favors the Requested Injunction. ...................... 24

   D.  The Public Interest Favors the Requested Injunction............................... 25

V.   Conclusion ................................................................................................... 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

i.

# TABLE OF AUTHORITIES

**Page**

## Cases

*Advanced Instructional Sys., Inc. v. Competentum USA, Ltd.,*
2015 7575925 (M.D. N.C. Nov. 25, 2015) ........................................................ 24

*All. for the Wild Rockies v. Pena,*
865 F.3d 1211 (9th Cir. 2017) ......................................................................... 13

*Allergia, Inc. v. Bouboulis,*
No. 14-CV-1566 JLS (RBB), 2015 WL 11735654
(S.D. Cal. Aug. 17, 2015) ............................................................................... 18

*Arcturus Therapeutics Ltd. v. Payne,*
No. 18-CV-MMA-NLS 2018 WL 2316790 (S.D. Cal. May 22, 2018) ............ 13

*Ariz. Dream Act Coal. v. Brewer,*
757 F.3d 1053 (9th Cir. 2014) ......................................................................... 23

*Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.,*
583 F.3d 832 (Fed. Cir. 2009) ......................................................................... 23

*Bemis Co. v. Summers,*
2019 WL 1004853 (E.D. Cal. Feb. 28, 2019) .................................................. 24

*Brain Injury Ass'n of Cal. v. Yari,*
2019 WL 4544419 (C.D. Cal. Aug. 9, 2019) ................................................... 16

*Ethicon, Inc. v. U.S. Surgical Corp.,*
135 F.3d 1456 (Fed. Cir. 1998) ....................................................................... 18

*Extreme Reach, Inc. v. Spotgenie Partners, LLC,*
2013 WL 12081182 (C.D. Cal. Nov. 22, 2013) .......................................... 24, 25

*Ferris Mfg. Corp. v. Carr,*
2015 WL 279355 (N.D. Ill. Jan. 21, 2015) ...................................................... 21

*Gabriel Technologies Corp. v. Qualcomm Inc.,*
857, F. Supp. 2d 997 (S.D. Cal. 2012) ............................................................ 21

*Gallagher Benefits Servs., Inc. v. De La Torre,*
2007 WL 4106821 (N.D. Cal. Nov. 16, 2007) ................................................. 23

*Gen. Elec. Co. v. Wilkins,*
2011 WL 1740420 (E.D. Cal. May 5, 2011) .................................................... 18

*Henry Schein, Inc. v. Cook,*
191 F. Supp. 3d 1072 (N.D. Cal. 2016) ...................................................... 17, 24

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

ii.

JAVO'S MEM. I/S/O MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. 19-CV-1859 CAB WVG

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Javo Beverage Co.*,
Case No. 11-10212 (Bankr. D. Del.) ................................................................. 16

*Klang v. Pflueger*,
2014 WL 12587028 (C.D. Cal. Oct. 2, 2014) .................................................... 22

*Leatt Corp. v. Innovative Safety Tech., LLC*,
No. 09-CV-1301-IEG-POR, 2010 WL 1526382
(S.D. Cal. Apr. 15, 2010) ......................................................... 14, 15, 17, 19

*MACOM Tech. Sols. Inc. v. Litrinium, Inc.*,
2019 WL 4282906 (C.D. Cal. June 3, 2019) ..................................................... 16

*MAI Sys. Corp. v. Peak Comput., Inc.*,
991 F.2d 511 (9th Cir. 1993) ............................................................................ 15

*MV Circuit Design, Inc. v. Omnicell, Inc.*,
2015 WL 1321743 (N.D. Ohio Mar. 24, 2015) ................................................ 21

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
420 F. Supp. 2d 1070 (N.D. Cal. 2006) ............................................................ 15

*Onyx Pharm., Inc. v. Bayer Corp.*,
2011 WL 7905185, at *9 (N.D. Cal. May 10, 2011) .............................. 20, 21, 22

*OrbusNeich Med. Co., BVI v. Bost. Sci. Corp.*,
694 F. Supp. 2d 106 (D. Mass. 2010) ......................................................... 21, 22

*Pac. Aerospace & Elecs., Inc. v. Taylor*,
295 F. Supp. 2d 1188 (E.D. Wash. 2003) ......................................................... 24

*Pixon Imaging, Inc. v. Empower Techs. Corp.*,
2011 WL 3739529 (S.D. Cal. Aug. 24, 2011) ................................................... 23

*Redfearn v. Trader Joe's Co.*,
20 Cal. App. 5th 989 (2018) ............................................................................. 18

*Softketeers, Inc. v. Regal W. Corp.*,
2019 WL 4418819 (C.D. Cal. May 6, 2019) ......................................... 13, 15, 25

*Sun Distrib. Co. v. Corbett*,
2018 WL 4951966 (S.D. Cal. Oct. 12, 2018) .............................................. *passim*

*Synopsys, Inc. v. Magma Design Automation, Inc.*,
2005 U.S. Dist. LEXIS 46595 (N.D. Cal. May 18, 2005) .................................. 20

*Turtle v. Castle Records Inc.*,
2005 WL 1159419 (N.D. Cal. May 17, 2005) ................................................... 20

*W. Directories, Inc. v. Golden Guide Directories, Inc.*,
2009 WL 1625945 (N.D. Cal. June 8, 2009) ..................................................... 23

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

iii.

JAVO'S MEM. I/S/O MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. 19-CV-1859 CAB WVG

1

**TABLE OF AUTHORITIES**
**(continued)**

2

**Page**

3

*Wang v. Palo Alto Networks, Inc.,*
   2014 WL 1410346 (N.D. Cal. Apr. 11, 2014)...................................................22

4

*WeRide Corp. v. Kun Huang,*
   379 F. Supp. 3d 834 (N.D. Cal. 2019)........................................................16, 17

5

6

*WesternGeco v. Ion Geophysical Corp.,*
   2009 WL 3497123 (S.D. Tex. Oct. 28, 2009) ...................................................22

7

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008)................................................................................................13

8

9

**Statutes**

10

18 U.S.C.
   § 1836 ..........................................................................................................13, 20

11

   § 1839 ....................................................................................................14, 16, 17

12

28 U.S.C. § 2201 ...................................................................................................18

13

Cal. Civ. Code
   § 3426.1 ................................................................................................14, 16, 17

14

   § 3426.2 ...........................................................................................................13
   § 3426.6 ...........................................................................................................20

15

Cal. Civ. Proc. Code
   § 337 ................................................................................................................23

16

   § 339 ................................................................................................................20
   § 343 ................................................................................................................23

17

18

Cal. Labor Code § 2860 ........................................................................................18

19

20

21

22

23

24

25

26

27

28

Cooley LLP
ATTORNEYS AT LAW
SAN DIEGO

iv.

JAVO'S MEM. I/S/O MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. 19-CV-1859 CAB WVG

# I.    INTRODUCTION[1]

This dispute is about Javo's former co-founder Stephen Corey ("Corey") and his new business venture California Extraction Ventures, Inc. ("CEV"), and their deliberate misappropriation of Javo's valuable trade secrets and confidential information.[2]   Javo is a leader in the business of coffee, tea, and botanical extracts, ingredients, and flavor systems.   Javo has spent years improving upon a unique and proprietary extraction method, which results in high quality, concentrated, and stable extracts.   Javo relies on its proprietary process to deliver a superior product that sets Javo apart from its competitors.   Javo has diligently guarded and protected its proprietary process as a trade secret for over two decades, only to recently learn that Corey and CEV have taken the process, publicly disclosed it, and falsely claimed it as their own by filing patent applications and plotting to unfairly compete with a new coffee extract product.

Defendant Corey is a former co-founder, executive, and director of Javo, who transferred and assigned all inventions during his employment to Javo and has ongoing contractual obligations to protect Javo's trade secrets and confidential information. Unbeknownst to Javo, beginning in March 2015, Corey began to prosecute patents based on Javo's proprietary extraction process.   Corey wrongly sought to patent technology that he had already transferred and assigned to Javo during his employment, and then purported to assign the patent rights to Defendant CEV—a new company he co-founded with Kurt Toneys ("Toneys"), who is the former President and CEO of Javo's predecessor.   To date, Corey and CEV have wrongfully obtained seven patents and have seven other pending patent applications that falsely claim a right to Javo's intellectual property.   As one of Javo's co-founders and lead inventors, there is no doubt that Corey—and by extension, CEV—understand the irreparable harm caused by

---

[1] All emphasis is added, and citations and internal quotation marks are omitted unless otherwise stated.   Per the Court's Civil Case Procedures, copies of documents already contained in the electronic docket are not being included as exhibits and are cited as "Doc. No. ___ at [ECF page]."

[2] "Javo" refers to Plaintiff Javo Beverage Co., Inc., as well as its predecessor entities.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

1.

JAVO'S MEM. I/S/O MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. 19-CV-1859 CAB WVG

Defendants' actions.   Corey acknowledged as much in his employment and confidentiality agreements with the company, where he expressly agreed Javo would be entitled to injunctive relief to enforce the agreements and protect its confidential and proprietary information.

Defendants' blatant disregard for the intellectual property rights of Javo and the contractual obligations that Corey still owes the company is astounding.   Javo has suffered significant damages already, including the loss of a potential sale of the company.  If Defendants are not enjoined, Javo will suffer additional irreparable harm through the continued dissemination of its trade secrets and what Javo recently discovered is CEV's plan to launch a competing coffee extract product imminently.  As a result, Javo respectfully seeks a preliminary injunction in order to prevent Defendants, and all of their representatives, agents, and persons acting in concert with them, from causing further irreparable harm to Javo, as follows:

1.     An order prohibiting Defendants from using Javo's trade secrets and other confidential information in CEV's process or selling any products derived from such information.

2.     An order prohibiting Defendants from using Javo's trade secrets and other confidential information to raise money from investors.

3.     An order prohibiting Defendants from filing any new patent applications based on Javo's trade secrets and/or other confidential information, or otherwise publicly disclosing the information.

4.     An order prohibiting Defendants from taking any steps to license or purporting to license or grant to third parties any rights in any issued patents and/or any pending patent applications claiming priority to provisional patent application, U.S. Pat. App. No. 62/134,497.

Remarkably, Defendants now seek to escape liability for their misappropriation by distorting the operative statutes of limitations in their recently filed motion to dismiss to argue Javo's claims are time-barred by four days.  Javo only recently discovered

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

2.

JAVO'S MEM. I/S/O MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. 19-CV-1859 CAB WVG

Defendants' theft and misuse of the company's confidential and proprietary information.  Prior to this discovery, Javo had no reason to suspect Corey had breached his contractual obligations to the company, and no reason to know that CEV even existed.  Accordingly, Javo's claims are both timely and likely to succeed on the merits, and preliminary injunctive relief is appropriate.

## II.  FACTUAL BACKGROUND

### A.  Javo is an Industry Leader in Coffee, Tea, and Botanical Extracts with a Proprietary Cold Brew Extraction Process.

Over more than two decades and at great expense to the company, Javo researched and developed a highly valuable, unique, and proprietary process for the manufacture of concentrated, high quality, stable extracts of coffee, tea, and other botanicals.  Javo has built a successful business and strong industry reputation around this unique offering.  Many large, well-known companies in the coffee, food, and beverage industry contract with Javo for its extraction and related manufacturing expertise.  Javo has continually maintained this process as a proprietary trade secret that is central to its business operations and value in the industry.  As cold brewing has gained popularity in recent years, the value of Javo's proprietary extraction process has increased and Javo's business has grown. (Petersmeyer Decl. ¶¶ 2, 13–14.) The typical cold brew process is a difficult, low-yield, non-scalable batch-by-batch process.  (*Id.* ¶ 13.)  As a result, large industry players have turned to Javo to cold brew their roasted coffee into an extract at scale.  (*Id.*)  Javo's trade secret extraction process includes, among other things, introducing purified, deionized water within particular temperature and pressure ranges into a proprietary columnar extraction vessel containing an extractable material (e.g., roasted coffee) that has been ground into multiple particle sizes and specially packed into the vessel into which deionized water is introduced, eventually resulting in a pure, concentrated extract flowing from the top of the vessel. (*See* Compl. ¶ 14; Petersmeyer Decl. ¶¶ 29–45.)

In order to prevent information regarding its proprietary extraction process from

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

3.

JAVO'S MEM. I/S/O MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. 19-CV-1859 CAB WVG

entering the public domain, Javo elected to keep the information protected as a trade secret. (Anderson Decl. ¶ 3; Petersmeyer Decl. ¶ 18; Riley Decl. ¶ 10.) Javo has not sought to patent its proprietary methods and processes, and the company holds no patents. (Anderson Decl. ¶ 23; Petersmeyer Decl. ¶ 50; Riley Decl. ¶ 10.) Given the difficulty in determining how an end-product extract is manufactured, Javo's proprietary process and innovations were not visible to third parties from Javo's commercial products and could not be reverse-engineered. (Riley Decl. ¶ 10.)

Javo has robust procedures in place to protect the secrecy of its confidential and proprietary extraction process. Javo requires its employees and contractors to sign agreements prohibiting the use and disclosure of confidential and proprietary information outside of Javo, and requires the return of sensitive materials upon termination. (Petersmeyer Decl. ¶¶ 20, 25.) Javo considers such confidentiality agreements to be a critical piece of Javo's effort to protect the company's trade secrets and other confidential information. (Petersmeyer Decl. ¶ 20; Anderson ¶ 4.) Javo limits employee access to sensitive information on a need-to-know basis, restricts the number of employees trained across multiple aspects of the trade secret process, and requires its employees who have access to sensitive information to keep the information confidential and not use the information for anything other than company purposes. (Petersmeyer Decl. ¶¶ 20–22.) As a policy, Javo also requires departing employees to return all confidential materials upon termination of their employment. (*Id.* ¶ 22.) Javo restricts access to its facilities and has implemented physical security measures, including key card access to doors to the manufacturing space and code locks to the lab, and alarm systems, as well as secure storage sites. (*Id.* ¶ 24.) Hourly facility employees use a biometric print geometry device to confirm their identity when clocking in and out of work. (*Id.*) Javo uses password protection on all computers, and stores sensitive company information in secure, limited-access databases. (*Id.* ¶ 23.) Javo also uses secure formula manufacturing software to store formulas and assist with the manufacturing process. (*Id.*) Javo's core trade secret is its extract manufacturing

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

4.

JAVO'S MEM. I/S/O MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. 19-CV-1859 CAB WVG

process, which is handled start-to-finish in-house after the coffee beans have been roasted. (*Id*. ¶ 28.) To the extent Javo relies on outside vendors or contractors for any services—such as manufacture of the extraction vessels—those third parties all sign non-disclosure agreements. (*Id*. ¶ 25.) Visitors to Javo's facilities are required to execute confidentiality and non-use agreements as a condition of entry. (*Id*. ¶ 26.)

Javo's proprietary process and innovations derive their economic value from being kept secret from competitors. Indeed, to Javo's knowledge, Javo's extraction process is able to yield a far more concentrated extract than any of Javo's competitors. (*Id*. ¶ 11.) Customers use Javo for the superior product and concentration level, and most customers have come to Javo directly through word of mouth based on its reputation in the food and beverage industry. (*Id*.; Anderson Decl. ¶¶ 8, 17.)

**B.** **Stephen Corey Is a Co-Founder and Former Executive of Javo Who Has Falsely Claimed Javo's Proprietary Processes as His Own.**

Corey is an original co-founder of Javo and its predecessors, and a principal inventor of Javo's trade secret extraction process. Corey was an employee of Javo and its predecessor entities from the company's inception until August 2011. (Anderson Decl. ¶ 6.) As an employee, Corey assigned all rights and interests he may have had in the proprietary extraction process to Javo, including through his Employment Agreement ("EA") and the associated Employee Confidentiality and Invention Assignment Agreement ("CIAA"), which he simultaneously executed on December 5, 2001. (Doc. No. 1-2; Anderson Decl. ¶ 5; Petersmeyer Decl. ¶ 20; Riley Decl. ¶ 6.) Corey's agreements contain strict confidentiality clauses preventing Corey from using outside his employment or publicly disclosing any Javo trade secrets or confidential information. Under both the EA and the CIAA, Corey expressly acknowledged that a breach of his confidentiality and invention assignment obligations would cause irreparable harm and agreed that Javo would be entitled to injunctive relief to enforce the agreements. (Doc. No. 1-2 at 11 (EA § 7.6); *id*. at 21 (CIAA § 11).)

Corey's departure from Javo in August 2011 was the result of the bankruptcy

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

5.

JAVO'S MEM. I/S/O MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. 19-CV-1859 CAB WVG

restructuring plan and was not contentious.  (Anderson Decl. ¶ 6.)  Following his termination, Corey began receiving severance payments under his EA, and in December 2011, Corey signed a release.  (*Id.*; Doc. 1-2 at 25.)  Javo had no reason to suspect Corey would breach the non-disclosure provisions of the EA and CIAA and act in direct contravention of his previous transfer and assignment of invention rights to Javo. (Petersmeyer Decl. ¶ 51 ; Anderson Decl. ¶¶ 22–23; Riley Decl. ¶ 5.)

Unbeknownst to Javo, Corey began to apply for U.S. patents broadly disclosing and claiming rights in the core aspects of Javo's highly valuable trade secrets and confidential information.  This began at least as early as March 17, 2015, when Corey filed provisional patent application, U.S. Pat. App. No. 62/134,497 (the "'497 Provisional Application").  (Doc. No. 1-3.)  Corey filed the first non-provisional patent applications in March 2016, and then assigned those patent applications to CEV—a new company he co-founded.  (*See generally* Doc. Nos. 7-3 and 7-4 (Patent Application Publications attached to Defendants' Motion for RJN).)  The first of the Corey/CEV patent applications published on September 22, 2016.  (*Id.*)  To date, Corey has obtained seven issued patents claiming priority to Corey's '497 Provisional Application, including U.S. Pat. No. 9,855,516 (issued Jan. 2, 2018); U.S. Pat. No. 10,112,124 (issued Oct. 30, 2018); U.S. Pat. No. 10,130,898 (issued Nov. 20, 2018); U.S. Pat. No. 10,207,200 (issued Feb. 19, 2019); U.S. Pat. No. 10,293,275 (issued May 21, 2019); U.S. Pat. No. 10,335,712 (issued July 2, 2019), and U.S. Pat. No. 10,399,006 (issued Sept. 3, 2019).  (*See generally* Doc. Nos. 7-3 and 7-4 (Patent Applications and Issued Patents attached to Defendants' Motion for RJN).) Corey has assigned all seven patents to CEV.  Corey also has seven additional published patent applications pending before the USPTO that claim priority to the '497 Provisional Application, which he also assigned to CEV.  (Trenda Decl. Ex. 11 (Patent Family).)

Javo did not discover Corey/CEV's patent filings until May 2019, in connection with due diligence being performed for potential sale of the company.  (Anderson Decl. ¶¶ 18–19; Riley Decl. ¶ 5; Petersmeyer Decl. ¶ 51.)  Because Javo does not have any

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

6.

JAVO'S MEM. I/S/O MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. 19-CV-1859 CAB WVG

patents and was not aware of any competitors attempting to patent similar technology, Javo was not monitoring USPTO records before that time. (Anderson Decl. ¶ 23; Petersmeyer Decl. ¶¶ 50–51; Riley Decl. ¶ 11.) Prior to discovering Corey's patent filings, Javo had no reason to suspect that Corey would return to working on extraction-related technologies years after his departure from Javo—let alone start a competing business in the very same space.

## C.   CEV Was Co-Founded by Stephen Corey and Kurt Toneys to Compete with Javo.

CEV was founded by Corey and Kurt Toneys in or around January 2015 and is now a Delaware Corporation. (Trenda Decl. Ex. 12, Ex. 13.) Corey is the President of CEV. (*Id.* Ex. 15.) Based on his LinkedIn page, Toneys has been CEV's CEO, Co-Founder, and Chairman of the Board since January 2015. (*Id.* Ex. 17 (Toneys LinkedIn).) In August 2018, CEV made a series of SEC filings showing CEV has offered and sold securities totaling approximately $2.6 million. (*Id.* Exs. 21-23.)[3] While expedited discovery is needed to know more, Javo believes Defendants have improperly disclosed Javo's proprietary information to investors, and that Defendants have used investor capital to fund their patent prosecution efforts and build out a manufacturing facility to compete with Javo.

Corey and Toneys previously worked together at Javo. From February 1999 through August 2001, Toneys was President, CEO, and a director of Javo's predecessor, North West Farms, which became La Jolla Fresh Squeezed Coffee Co., Inc. ("LJFSC"). (Riley Decl. ¶ 7; Trenda Decl. Ex. 16 (5/26/2000 Form 10-KSB).) During that time, Corey was Secretary, Vice President, and a director of LJFSC. (Trenda Decl. Ex. 16.) While serving as officers and directors of the company, Toneys and Coreys represented

---

[3] *See* Trenda Decl. Ex. 21 (Form D filing dated August 3, 2018, showing sale of securities amounting to $13,488 commencing December 31, 2014); *id.* Ex. 22 (Form D filing dated August 3, 2018, showing sale of securities amounting to $11,040 commencing May 1, 2017); *id.* Ex. 23 (Form D filing dated August 6, 2018, showing sale of securities amounting to $2,560,998 commencing February 12, 2018).

Cooley LLP
Attorneys At Law
San Diego

7.

Javo's Mem. I/S/O Motion
for Preliminary Injunction
Case No. 19-cv-1859 CAB WVG

to investors that the extraction method developed by Corey at Javo was proprietary.  For example, SEC filings signed by Toneys touted how "Corey and his talented group of technicians and consultants perfected the commercialization of the cold coffee product and manufacturing process" and that "[t]his research and development culminated into the HIPEX 7000 . . . brewing vessel which manufactures the Company's cold-brewed gourmet coffee extract." (*Id.* Ex. 16 at 2.)  Both Toneys and Corey also know Javo has historically relied on trade secret protection.  Indeed, SEC filings signed by Toneys indicate, "[t]he Company is protecting the proprietary rights of the cold-brewing process using a strictly enforced trade secret protocol" and that a "patent application has not been filed." (*Id.* Ex. 16 at 7.)

In August 2001, Toneys resigned from LJFSC.  (Riley Decl. ¶ 8.)  Toneys' letter of resignation pledged: "I will continue to support the Company in every reasonable way and I wish you the best of luck."  (Riley Decl. Ex. 2.)  On LinkedIn, Toneys describes his past work for Javo as "[l]iterally led company [that] pioneered and then perfected commercial application of proprietary cold water brewing technology." (Trenda Decl. Ex. 17.)  Similar to Corey, Toneys signed a Nondisclosure Agreement (the "NDA") during his employment and acknowledged that any disclosure of the company's trade secret and confidential information, including Javo's "[m]anufacturing processes" and "formulae," "will cause [LJFSC] irreparable injury."  (Riley Decl. Ex. 1, Toneys NDA.)  Accordingly, Toneys further agreed to not use any of Javo's confidential information "other than pursuant to [his] employment by and/or for the benefit of the Company." (*Id.*)  Javo had no reason to suspect that Toneys would breach his NDA, induce Corey to breach his EA and CIAA, and form a new company to unfairly compete with Javo by stealing its proprietary extraction process.  (Riley Decl. ¶ 8.)

There is very little public information available on CEV, and Defendants have refused to disclose their intent for CEV's business to date.  (Trenda Decl. ¶ 21.)  Based on additional investigation, Javo believes Defendants plan to double down on their

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

8.

JAVO'S MEM. I/S/O MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. 19-CV-1859 CAB WVG

outrageous conduct by having CEV produce a competing commercial product. (Trenda Decl. ¶ 22.)  Evidence of CEV's apparent plan can be found on the LinkedIn pages of certain employees.  For example, Philip Dodge—who lists himself as Senior Vice President at CEV since April 2017—describes CEV as a "technology-based natural products extraction company that uses newly-patented extraction systems which provide superior efficiency and efficacy in natural, clean extractions." (Trenda Decl. Ex. 18.)  Dodge refers to CEV's "disruptive technologies" as a "Catalyzing Pressure-Wave® Architecture" and claims that CEV's technology "has been described as one of the most transformational technologies in the industry since 1935." (*Id.*)  Javo's former marketing consultant, Steven Siegel, now apparently works for CEV as VP Marketing and Sales.  (Trenda Decl. Ex. 20.)  He describes CEV as having "game-changing technology [that] means superior extractions for teas, nutraceuticals, and for the ingredient flavor and pharma industries." (*Id.*)  Siegel describes CEV's product as "the world's best cold brew coffee." (*Id.*)  According to another employee, Shane Archer, CEV is "[b]uilding out [a] manufacturing facility to begin production in 2019." (Trenda Decl. Ex. 19.)

**D.    Corey and CEV's Misappropriation of Javo's Trade Secrets.**

**1.    Corey and CEV's Patent Filings.**

There are substantial similarities between Javo's proprietary extraction process and Corey/CEV's offending patent filings, including for example, operating conditions and the structural configuration of the extraction vessel.  (*See generally* Petersmeyer Decl. (detailing Javo's proprietary extraction process).)  Corey and CEV's theft of Javo's proprietary extraction process is evident on the face of the '497 Provisional Application, which is titled "Coffee Extraction Method and Apparatus" and lists Corey as the inventor.  (Doc. No. 1-3 at 2.)  The '497 Provisional Application describes the field of invention as generally relating to "a method of coffee bean extraction and apparatus." (*Id.* at 2, para [001].)  The '497 Provisional Application also describes the invention more specifically as "a novel method for precisely extracting purified

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

9.

JAVO'S MEM. I/S/O MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. 19-CV-1859 CAB WVG

1   supreme coffee from coffee bean mixture using precise water structuring parameters,

2   pressure gradients and temperature profiles." (*Id.* at 2.)

3       Other similarities abound. In the '497 Provisional Application, Corey refers to

4   "categories" of operations that "are critical, absolutely vital and necessary to the new

5   generation of the Gen 7 extraction process." (Doc. No. 1-3 at 26, para [0056].) Public

6   filings and literature on Javo's predecessor entities describes its proprietary products as

7   "seventh generation cold water extraction technology" that it deployed in February

8   2000. (Riley Decl. Ex. 3 at 1 (May 2001 company profile); *see also* Trenda Decl. Ex.

9   16 at 2 (5/26/2000 Form 10-KSB) ("This research and development culminated into the

10   HIPEX 7000 . . .); *id.* at 6 ("The HIPEX 7000, LJCC's brewing vessel, is refined and

11   highly efficient seventh generation technology.").) Corey's described extraction vessel

12   in the '497 Provisional Application and related patent specifications also appears

13   substantially similar to Javo's proprietary extraction vessel. (*See* Petersmeyer Decl. ¶¶

14   29–32, Ex. 6.)

15       Tellingly, the '497 Provisional Application repeatedly references terms used by

16   Corey at Javo. (*See* Petersmeyer Decl. ¶¶ 33, 40.) For example, the '497 Provisional

17   Application states, "the coffee itself became its own best filtering agent." (Doc. No. 1-

18   3 at 20, para [0043].) While at Javo, Corey frequently used the same phrase, and the

19   related term "grind matrixing." (*Id.* at 11, para [0024].) The term "grind matrix" also

20   appears in the title of the '124 and '275 patents and throughout the specifications in the

21   patents filed by Corey/CEV. (Doc. No. 7-3 at 116–152 ('124 patent titled "Poly-grain

22   grind matrix of raw materials for use with an extraction column"); Doc. No. 7-4 at 228–

23   264 ('275 patent titled "Method of making and using a poly-grain grind matrix of raw

24   materials").) Corey sent multiple emails to Javo employees on the "grind matrix"

25   concept. (*See, e.g.*, Petersmeyer Decl. Exs. 7–8.) The '497 Provisional Application

26   also admits that Corey conceived of grind matrixing and the filtration core during the

27   course of his employment at Javo. (Doc. No. 1-3 at 20, para [0043] (stating "it took the

28   Applicant six years of testing to figure it out" and that "[t]his only happened when the

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

10.

JAVO'S MEM. I/S/O MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. 19-CV-1859 CAB WVG

Applicant was able to build a Lexan, transparent vessel".)[4]

Another example of a term frequently used by Corey at Javo are the frequent references to "pressure wave" technology in the '497 Provisional Application, the title of the '006 patent, and throughout the specifications in the patents filed by Corey/CEV. (*See, e.g.,* Doc. 1-3 at 12, para. [0025]; *id.* at 18, para. [0040]; *id.* at 19, para [0041]; *id.* at 26, para [0056]; Doc. 7-4 at 153 ("Catalyzing Pressure Wave Extraction Method and Apparatus").)  CEV claims the "pressure-wave" as its novel technology, but Javo has documentation created by Corey in the course of his employment at the company in which Corey describes the "pressure-wave" within the Javo process.  (*See, e.g.,* Petersmeyer Decl. Ex. 4 (2004 extraction log listing "[d]ecent extraction, fairly even upwelling of pressure wave, consistant [sic] transition through diffuser [sic]").)

The '497 Provisional Application and even refers to "Javo" processes in certain figures.  For instance, Figure 7 of the '497 Provisional Application is titled "Coffee Sequencing Sets & Subsets Flow-Chart" and addresses both coffee beans and "hungry water."[5]  (Doc. No. 1-3 at 37–38, Figure 7.)  The chart even has the word "Javo" written ten times next to multiple steps relating to the extraction process:



---

[4] At minimum, two of those "six years" were at Javo because six years prior to March 17, 2015, is March 2009, and Corey worked at Javo until his termination in August 2011.  (Anderson Decl. ¶ 6.)  While at Javo, Corey often performed testing using a transparent Lexan vessel.  (Petersmeyer Decl. ¶ 15.)
[5] Corey often used the term "hungry water" or "angry water" to describe purified, deionized water during his time at Javo.  (Petersmeyer Decl. ¶ 40.)

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

11.

JAVO'S MEM. I/S/O MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. 19-CV-1859 CAB WVG

These are just examples of how Defendant's theft of Javo's trade secrets and confidential information is evident from the offending patent family.

### 2. Evidence Suggests that CEV Plans to Use Javo's Intellectual Property for an Imminent Product Launch.

Additional research has revealed that CEV is building out production space in the Sorrento Valley area of San Diego. Shortly after CEV's last and largest disclosed round of offering resulting in the sale of $2.5 million in securities (Trenda Decl. Ex. 23), CEV began building production space at 10130 Sorrento Valley Road, San Diego, CA 92121. (Trenda Decl. ¶¶ 22–28.) According to building permits, CEV has been converting office space into a factory for coffee and juice concentrate products since March 2018. (Trenda Decl. Exs. 26–28.) As detailed above, the LinkedIn page for a former CEV employee states that CEV is "[b]uilding out manufacturing facility **to begin production in 2019**." (Trenda Decl. Ex. 19 at 1 (Shane Archer LinkedIn (emphasis added)).)

Although Javo does not know for certain what product(s) CEV intends to produce in this facility, it has reason to suspect CEV intends to misuse Javo's proprietary extraction process to develop a competing product. For example, CEV has filed for trademarks on "Instant Bliss" and "Compresso." The label associated with those filings describes the product as "24:1 Natural Coffee Compresso" that provides "24 BLISSFUL SERVINGS." (Trenda Decl. Ex. 24.)



Steven Siegel—CEV's VP of Marketing and Sales—describes the product as a "concentrate": "Just 2 teaspoons of our coffee concentrate in 8 ounces of hot water or cold/over ice and you're done. No machines, no filters – we've brewed for you."

Cooley LLP
Attorneys At Law
San Diego

12.

Javo's Mem. I/S/O Motion
for Preliminary Injunction
Case No. 19-cv-1859 CAB WVG

(Trenda Decl. Ex. 20 at 2.)  Expedited discovery (which Javo intends to seek) is needed to learn more about what is being touted as "the world's best cold brew coffee."  (*Id.*)

## III.   LEGAL STANDARD

The DTSA and CUTSA both expressly authorize the court to grant an injunction to protect against "actual or threatened misappropriation" of trade secrets.  *Softketeers, Inc. v. Regal W. Corp.*, 2019 WL 4418819, at *11 (C.D. Cal. May 6, 2019); 18 U.S.C. § 1836(b)(3)(A); Cal. Civ. Code § 3426.2(a).  A party seeking a preliminary injunction must show "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).   Under the Ninth Circuit's "sliding scale" approach, a stronger showing on the balance of hardships may support issuing a preliminary injunction where there is "a lesser showing than likelihood of success on the merits" such as "serious questions going to the merits," so long as the other two *Winter* factors are satisfied.  *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017).  Under the "sliding scale" approach, "serious questions" need not "present a probability of success, but must involve a fair chance of success on the merits."  *Arcturus Therapeutics Ltd. v. Payne*, No. 18-CV-MMA-NLS 2018 WL 2316790, at *4 (S.D. Cal. May 22, 2018).  Javo satisfies the standard for a preliminary injunction.

## IV.   ARGUMENT

### A.   Javo Is Likely to Succeed on the Merits of Its Claims.

#### 1.   Javo's Trade Secret Claims Against Corey and CEV.

Javo has a strong likelihood of success on the merits.  To establish trade secret misappropriation, both the DTSA and CUTSA require a plaintiff to allege the existence and ownership of a trade secret, and actual or threatened misappropriation of the trade secret.  18 U.S.C. § 1836(b)(3)(A); Cal. Civ. Code § 3426.2; *see also Sun Distrib. Co. v. Corbett*, 2018 WL 4951966, at *3 (S.D. Cal. Oct. 12, 2018) (claims under the DTSA and UTSA have "substantially similar elements").  Javo satisfies each element.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

13.

JAVO'S MEM. I/S/O MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. 19-CV-1859 CAB WVG

### a.    Javo's Extraction Process Is a Valuable and Closely Guarded Trade Secret.

A "trade secret" is information that (1) "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable [by] another person who can obtain economic value from [its] disclosure or use," and (2) is subject to reasonable measures to maintain its secrecy.  18 U.S.C. § 1839(3); Cal. Civ. Code § 3426.1(d).  "[D]esigns, prototypes, methods, techniques, processes, [and] procedures" are all protectable as trade secrets.  18 U.S.C. § 1839(3); Cal. Civ. Code § 3426.1(d).  As detailed above, Javo's trade secrets derive independent economic value from their secrecy and are subject to rigorous measures to prevent their disclosure.

**Independent Economic Value.**  "Information that is kept confidential and that was obtained as a result of a significant expenditure of time and resources undoubtedly has 'independent economic value' to its owner." *Leatt Corp. v. Innovative Safety Tech.*, *LLC*, No. 09-CV-1301-IEG-POR, 2010 WL 1526382, at *6 (S.D. Cal. Apr. 15, 2010); *see also Sun Distrib. Co., LLC*, 2018 WL 4951966, at *4.

Javo and its predecessor entities have spent over two decades developing Javo's proprietary trade secret extraction process.  Javo has expended millions of dollars in developing and protecting its trade secrets during this time.  Through these efforts, Javo has become recognized as the leader in producing high quality, concentrated, and stable coffee, tea, and botanical extracts, ingredients, and flavor systems.  Javo has also achieved significant domestic and international sales among its numerous clients in the coffee, food, and beverage industries, who rely on Javo specifically for its extraction and manufacturing expertise.  As a result of its commercial success and proprietary extraction process, Javo was well positioned for a potential strategic sale.  However, the discovery of Defendants' malfeasance in May 2019 during due diligence by a prospective buyer ultimately forced Javo to terminate the process.  Damages are estimated to exceed $50 million, and include the reduction in bid price from potential

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

14.

JAVO'S MEM. I/S/O MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. 19-CV-1859 CAB WVG

buyers, less advantageous deal terms, additional time and money spent on negotiations, and the ultimate termination of the process.  (Anderson Decl. ¶ 21.)   These damages demonstrate the economic value of Javo's trade secrets.  *See Leatt Corp.*, 2010 WL 1526382, at *6; *Sun Distrib. Co.*, LLC, 2018 WL 4951966, at *4.

Javo's closely guarded trade secrets were not generally known.  (*See* Anderson Decl. ¶ 3; Petersmeyer Decl. ¶¶ 19–26; Riley Decl. ¶¶ 10–11.)  Corey and Toneys were aware of this from their time at Javo.  (*See, e.g.*, Trenda Decl. Ex. 1, 6 at 2, 7 (5/26/2000 Form 10-KSB); Doc. No. 1-2 (Corey's EA and CIAA); Riley Decl. Ex. 1 (Toneys NDA).)  Defendants have postured that Javo's trade secret extraction process was publicly known in the prior art.  (Doc. No. 7-1 at 8.)  This is wholly inconsistent with public representations that Toneys and Corey made to the market when they were Management.  (*See, e.g.*, Trenda Decl. Ex. 16 (5/26/2000 Form 10-KSB); Riley Decl. Ex. 3.)  But even if this were true, the process still enjoys trade secret protection "as long as the combination of all such information is not generally known."  *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 420 F. Supp. 2d 1070, 1089–90 (N.D. Cal. 2006) ("Combinations of public information from a variety of different sources when combined in a novel way can be a trade secret."), *aff'd*, 221 F. App'x 996 (Fed. Cir. 2007); *see also Leatt Corp.*, 2010 WL 1526382, at *6 ("[T]he focus is on the information or product as a whole, not its individual components.").

**Reasonable Secrecy Measures.**   As detailed above, Javo takes reasonable precautions to protect its highly valuable trade secrets and other confidential information from being disclosed outside the company or falling into the hands of a competitor.  (*See supra* Section II(A).)  For example, Javo requires its employees and contractors to sign agreements prohibiting the use or disclosure of trade secret and confidential information outside of Javo.  (Petersmeyer Decl. ¶¶ 20, 25; Anderson Decl. ¶ 4.)  *See MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 521 (9th Cir. 1993) (employee confidentiality agreements were a reasonable secrecy measure); *Softketeers, Inc.*, 2019 WL 4418819, at *8 (same); *Leatt Corp.*, 2010 WL 1526382, at *6 (same).

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

15.

JAVO'S MEM. I/S/O MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. 19-CV-1859 CAB WVG

Javo also limits employee access to sensitive information on a need-to-know basis, uses secure manufacturing software and stores sensitive company information in secure, limited-access databases, and restricts physical access to its facilities.  (Petersmeyer Decl. ¶¶ 21–24.)  These measures are reasonable to protect Javo's trade secrets.  *See WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 847 (N.D. Cal. 2019) (password protected systems); *Brain Injury Ass'n of Cal. v. Yari*, 2019 WL 4544419, at *4 (C.D. Cal. Aug. 9, 2019) (secure database); *MACOM Tech. Sols. Inc. v. Litrinium, Inc.*, 2019 WL 4282906, at *8 (C.D. Cal. June 3, 2019) (restricted access to facilities).

### b.    CEV and Corey Misappropriated Javo's Trade Secrets.

Corey and CEV have misappropriated Javo's trade secrets by taking Javo's proprietary extraction process, publicly disclosing it, and falsely claiming it as their own—first by filing patent applications and now by plotting to unfairly compete with a new coffee extract product.  "Misappropriation" occurs through the "disclosure or use of a trade secret" without consent by a person who "knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain [its] secrecy . . . or limit [its] use," or derived through a person who owed such a duty.  18 U.S.C. § 1839(5)(B); Cal. Civ. Code § 3426.1(b).

Corey assigned to Javo all rights and interest he may have had in Javo's proprietary extraction process through his EA and the associated CIAA.  (Doc. 1-2 at 19–29 (CIAA § 8).)  Corey knew he was under a duty not to disclose or use any of Javo's trade secrets or confidential information because both agreements contain strict confidentiality clauses.  (*See id.* at 10–11 (EA § 7); *id.* at 17–18, 20–21 (CIAA §§ 2–3, 10).)  Among other things, Corey "agree[d] that he will protect the value of the Confidential Information of [Javo] and will prevent their misappropriation or disclosure."  (*Id.* at 20–21 (CIAA § 10.2); *see also id.* at 17–18 (CIAA § 2 (defining "confidential information" to include trade secrets).)

During the bankruptcy, Javo identified its ownership of "proprietary manufacturing processes" with an "[u]nknown value."  (Trenda Decl. Ex. 29 (*In re Javo*

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

16.

JAVO'S MEM. I/S/O MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. 19-CV-1859 CAB WVG

*Beverage Co.*, Case No. 11-10212 (BLS), Dkt. No. 111 (Bankr. D. Del.)).)  Corey did not file any proof of claim against Javo, and filed no objections to the confirmation of Javo's bankruptcy reorganization plan.  (Trenda Decl. ¶ 30.)  Corey was subsequently terminated in August 2011, as part of the bankruptcy restructuring.  (Anderson Decl. ¶ 6.)  Corey left Javo on good terms, received a severance, and signed a release. (Anderson Decl. ¶¶ 5–6; Doc. No. 1-2.)  Until recently, as far as Javo was aware, Corey had abided by the terms of the EA and CIAA both during and after his employment. (Anderson Decl. ¶ 22; Riley Decl. ¶ 5.)  Javo was shocked in May 2019, when it first became aware that Corey had breached his duty of confidentiality by filing patent applications on Javo's proprietary process and purporting to assign the rights to CEV. (*See supra* Section II(B).)  Javo has since discovered Corey and CEV are soon planning to put Javo's trade secrets into commercial practice.  (*See supra* Section (D)(2).)

Corey's disclosure and misuse of Javo's trade secrets without Javo's consent is clear misappropriation.  *See* 18 U.S.C. § 1839(5)(B); Cal. Civ. Code § 3426.1(b); *see also Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016) (finding likelihood of success on trade secret misappropriation claim based on confidentiality provisions in employment agreements); *Leatt Corp.*, 2010 WL 1526382, at *7 (same). Through both Corey and Toneys, knowledge of Corey's misappropriation is imputed on CEV—which is thus equally liable for the misappropriation that it has improperly benefitted from and plans to unfairly compete with against Javo.  *See WeRide Corp.*, 379 F. Supp. 3d at 850 (former employee's senior role at rival made it likely plaintiff would be able to show company knew former employee misappropriated plaintiff's trade secrets); *Leatt Corp.*, 2010 WL 1526382, at *7 (same).

### 2.   Javo's Patent Ownership Claims and Claim Against CEV for Intentional Interference.

Javo is likely to prevail on its request for declaratory judgment that Javo is the owner of right, title, and interest in the '516, '124, '898, '200, '275, '172, and '006 patents and any additional patents that may issue that claim priority to the '497

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

17.

JAVO'S MEM. I/S/O MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. 19-CV-1859 CAB WVG

Provisional Application.  "To bring a claim pursuant to the Declaratory Judgment Act, a plaintiff need only show that there is a substantial, immediate controversy between the parties that warrants a declaratory judgment by a court." *Allergia, Inc. v. Bouboulis*, No. 14-CV-1566 JLS (RBB), 2015 WL 11735654, at *5 (S.D. Cal. Aug. 17, 2015); *see also* 28 U.S.C. § 2201.  Corey's primary role during his tenure at Javo was to develop and refine Javo's proprietary extraction process.  (Trenda Decl. Ex. 16 at 2 (5/26/2000 Form 10-KSB); Petersmeyer Decl. ¶ 15.)  Under the CIAA, Corey transferred and assigned his right, title, and interest in all such inventions to Javo or its predecessors. (Doc. 1-2 at 19–20 (CIAA §§ 8.2, 8.3).)  By contract, Javo is therefore the rightful owner of the patents and patent applications claiming priority to the '497 Provisional Application.   This is also consistent with Javo, as Corey's employer, being the presumptive owner of anything he invented during his employment under California Labor Code § 2860, which provides that "[e]verything which an employee acquires by virtue of his employment . . . belongs to the employer."  *See Gen. Elec. Co. v. Wilkins*, 2011 WL 1740420, at *10–11 (E.D. Cal. May 5, 2011) (finding "a high probability of success" on patent ownership claim where defendant "conceived the technology" while employed by plaintiff and "being paid to invent").[6]  Accordingly, Javo is entitled to a declaratory judgment affirming its ownership interests in the patents.

Javo is likely to prevail on its claim against CEV for intentional interference for many of the same reasons it will prevail on its patent ownership claim.[7]  Through Corey, CEV was aware of the existence of the EA and the CIAA.  (Doc. No. 1-2.)  Toneys had similar non-disclosure obligations under his NDA, which gave CEV additional

---

[6] To the extent that other employees of Javo (with similar assignment obligations to Corey's CIAA) also made inventive contributions to the subject matter claimed in the patents, those employees must be named as joint inventors.  *See, e.g., Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998) ("[A] co-inventor need not make a contribution to every claim of a patent.  A contribution to one claim is enough.").

[7] Intentional interference requires: "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage."  *Redfearn v. Trader Joe's Co.*, 20 Cal. App. 5th 989, 997 (2018).

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

18.

JAVO'S MEM. I/S/O MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. 19-CV-1859 CAB WVG

knowledge of the importance of such protections.  (Riley Decl. ¶ 7, Ex. 1.)  CEV knowingly interfered with Corey's contractual relations with Javo by inducing Corey to disclose trade secret and other confidential information in violation of the EA and CIAA.  CEV also interfered with Corey's obligation to assign to Javo any patents for inventions Corey conceived of during his employment.  Defendants argue Javo's intentional interference claim is pre-empted by CUTSA, but this claim exists completely independently of Javo's trade secret claims because: (1) CEV improperly solicited non-trade secret confidential information from Corey; and (2) CEV induced Corey to assign to CEV the rights to patents and patent applications that CEV knew rightfully belonged to Javo under the CIAA.  Thus, Javo is likely to succeed in showing intentional interference by CEV.  *Leatt Corp.*, 2010 WL 2803947, at *6–7 (UCL and tortious interference claims not preempted to the extent not based on trade secrets).

***

Javo has a strong likelihood of success on its claims.  Corey was under ***a duty to protect and to not disclose or misuse*** Javo's valuable trade secrets or other confidential information, including the inventions that he had assigned and transferred to Javo.  In blatant disregard for his contractual obligations, Corey took and patented Javo's proprietary extraction process and assigned the patents to CEV in a bid to destroy Javo's trade secret protection and gain an unfair advantage in launching a competing coffee extract product.  This is improper, and Javo will suffer irreparable harm if Defendants are not stopped.

### 3.    Javo's Claims Are Timely.

Javo filed this action less than five months after discovering the offending patents and patent applications in mid-May 2019, which is the same time when Javo was first put on inquiry notice of its potential claims against Defendants.  Upon discovering the misconduct, Javo sent a cease-and-desist letter and engaged in discussions with Defendants.  (Riley Decl. ¶ 12, Ex. 9.)  Now, in an effort to cut off this litigation before it gets to the merits, Defendants have moved to dismiss based on an incorrect application

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

19.

JAVO'S MEM. I/S/O MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. 19-CV-1859 CAB WVG

of the applicable statutes of limitations.  (Doc. No. 7.)  Defendants do not argue that Javo discovered their misconduct long ago and failed to act on its claims, nor do they argue Javo had a reason to suspect its claims earlier and failed to investigate. Defendants know neither situation occurred here.  Instead, they argue Javo's claims are time-barred because Javo should automatically be held to immediate constructive notice of Defendants' tortious conduct the instant the first of the offending patent applications became publicly available on September 22, 2016.[8]  That is not the law.

### a. Publication of a Patent Application Does Not Automatically Trigger the Statute of Limitations.

Both DTSA and CUTSA have a three-year discovery rule statute of limitations based on when misappropriation "*is discovered or by the exercise of reasonable diligence should have been discovered*."  *See* 18 U.S.C. § 1836(d); Cal. Civ. Code § 3426.6.  Javo's claims for patent ownership and interference with contractual obligations are subject to a similar "discovery rule."  *See Turtle v. Castle Records Inc.*, 2005 WL 1159419, at *2 (N.D. Cal. May 17, 2005); Cal. Civ. Proc. Code § 339.

Under this standard, the limitations period is only triggered if an injured party was privy to facts sufficient to put a reasonable person on "inquiry notice" of injury and further investigation would have turned up facts establishing the injury.  *See, e.g.*, *Synopsys, Inc. v. Magma Design Automation, Inc.*, 2005 U.S. Dist. LEXIS 46595, at *18–19 (N.D. Cal. May 18, 2005) (publication of international patent application did not render a misappropriation claim untimely because the plaintiff "was not chargeable with notice of the publication of [defendant's] PCT application *unless and until [plaintiff] had reason to suspect that its confidential information had been misappropriated*"); *Onyx Pharm., Inc. v. Bayer Corp.*, 2011 WL 7905185, at *9 (N.D. Cal. May 10, 2011) (declining to impose constructive notice on the basis of a patent application "[g]iven the large number of patent applications likely filed by Bayer ever

---

[8] It now appears that Defendants deliberately stretched settlement discussions into late September 2019, in an effort to support their incorrect statute of limitations theory.

Cooley LLP
Attorneys At Law
San Diego

20.

Javo's Mem. I/S/O Motion
for Preliminary Injunction
Case No. 19-cv-1859 CAB WVG

year *and the lack of undisputed evidence that Onyx had reason to believe in 2005 that Bayer might be acting in contravention of its collaboration obligations*").[9]

Here, there is "nothing which would suggest that [Javo] had any reason to suspect a potential misappropriation of its confidential information, such that it was under a duty to investigate" by monitoring the USPTO records for potential patent filings by Corey or CEV—a company Javo did not even know existed.  *Onyx Pharm., Inc.*, 2011 WL 7905185, at *9 (quoting *OrbusNeich Med. Co.*, 694 F. Supp. 2d at 117).  Judge Battaglia's detailed analysis of the timeliness of a trade secret misappropriation claim in *Gabriel Technologies Corp. v. Qualcomm Inc.*, 857, F. Supp. 2d 997 (S.D. Cal. 2012), illustrates the point.  There, the patent applications and issued patents allegedly containing plaintiff's trade secrets were publicly available beginning in January 2003, when plaintiff's co-founder and chief technology officer suspected a "direct rip-off" but did nothing because "I'm a bad businessman. . . . I didn't think it was important." *Id.* at 1004, 1006, 1006 n. 13.  For purposes of triggering the statute of limitations, the issue was not when the patent materials published, but if they were publicly available when the plaintiff first suspected the alleged misappropriation in January 2003.  *Id.* at 1006–1007.  Here, by contrast, Javo had no knowledge (or reason to know) that Corey formed a new competing company, let alone that Corey was in the process of filing multiple patent applications on Javo's technology in direct contravention of his contractual obligations to the company.  *Cf. id.* at 1006 (plaintiff "was well aware . . . that [defendant] was filing multiple patent applications covering a[ ]GPS technology" and "[s]ome of the applications and issued patents . . . were publicly available in January 2003" when plaintiff "had a suspicion of wrongdoing").

---

[9] Other courts similarly reject triggering a statute of limitations solely upon publication of a patent application.  *See, e.g.*, *OrbusNeich Med. Co., BVI v. Bost. Sci. Corp.*, 694 F. Supp. 2d 106, 117 (D. Mass. 2010) (it would be "unreasonably burdensome to impose a duty to conduct this kind of searching inquiry, in the absence of evidence that some precipitating event should have provoked [plaintiff] to do so"); *Ferris Mfg. Corp. v. Carr*, 2015 WL 279355, at *4 (N.D. Ill. Jan. 21, 2015) (same); *MV Circuit Design, Inc. v. Omnicell, Inc.*, 2015 WL 1321743, at *10 (N.D. Ohio Mar. 24, 2015) (same).

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

21.

JAVO'S MEM. I/S/O MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. 19-CV-1859 CAB WVG

Simply put, Defendants' incorrect position that Javo's claims are time-barred based on the date the first offending patent applications published "ignores the essential prerequisite to such an imposition [of constructive notice]: the plaintiff must have been under a *duty* to inquire into the contents of the relevant public records." *OrbusNeich*, 694 F. Supp. 2d at 117 (emphasis in original) ("Such a duty arises only when sufficient facts were available to provoke a reasonable person to investigate their contents.").[10] Javo was not on actual or inquiry notice until May 2019, when it discovered the offending patents and patent applications. Javo's trade secret claims are timely.

### b. Even Under Defendants' Incorrect Theory, Javo's Declaratory Judgment of Patent Ownership Is Timely.

Javo's declaratory judgment claim for ownership of the issued patents is timely even under Defendants' incorrect theory of automatic constructive notice (which is not the law).[11] Javo's claims regarding the '516, '124, '898, '200, '275, '172, and '006 patents could not have accrued until, at earliest, the date when the first patents in the family actually issued on January 2, 2018—not when the first of the applications published. *See Onyx*, 2011 WL 7905185, at \*9 ("In ordinary tort and contract actions, the statute of limitations begins to run upon the occurrence of the last element necessary to the cause of action."). Additionally, while Javo agrees the statute of limitations for a declaratory judgment claim is equivalent to the statute of limitations for the underlying wrong (Doc. No. 7-1 at 16:27–17:8), the underlying "wrong" alleged in connection with

[10] Defendants' authority is distinguishable on the same inquiry notice point. *See Wang v. Palo Alto Networks, Inc.*, 2014 WL 1410346 (N.D. Cal. Apr. 11, 2014) (plaintiff had contemporaneous knowledge of defendants' competitive activities and breach of NDA obligations); *Klang v. Pflueger*, 2014 WL 12587028 (C.D. Cal. Oct. 2, 2014) (plaintiff made disclosure without any confidentiality agreement in place and was patenting inventions in same field); *WesternGeco v. Ion Geophysical Corp.*, 2009 WL 3497123 (S.D. Tex. Oct. 28, 2009) (claimant was patenting its technology and should have been monitoring filings by competitors, especially after the alleged misappropriator failed to return a prototype). Further, none of Defendants' cited authority applies instantaneous constructive notice to bar a claim by just four days. *Wang*, 2014 WL 1410346, at \*6 (5 year delay); *Klang* 2014 WL 12587028, at \*4 (more than 6 year delay); *WesternGeco*, 2009 WL 3497123, at \*4 (9 year delay).

[11] Defendants' incorrect theory is even more strained here, as Defendants would have the cause of action start accruing before the first patent had even issued in the family.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

22.

JAVO'S MEM. I/S/O MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. 19-CV-1859 CAB WVG

this claim is Corey's breach of his duty to transfer and assign his inventions to Javo under the CIAA.  (*See, e.g.*, Doc. No. 1 ¶ 99.)  Thus, the declaratory judgment claim sounds in contract—not trade secret misappropriation—and the applicable statute of limitations is four years.[12]  Cal. Civ. Proc. Code § 337; *see Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 583 F.3d 832, 846 (Fed. Cir. 2009) (applying four year statute of limitations to patent ownership claim under California law), *aff'd on other grounds*, 563 U.S. 776 (2011).  Thus, even under Defendants' incorrect calculation, the statute of limitations runs through at least September 2020.

## B.   Without Injunctive Relief, Javo Is Likely to Suffer Irreparable Harm.

Javo has already suffered and is likely to continue to suffer irreparable harm absent a preliminary injunction.  As detailed by one of CEV's recent employees, CEV is "[b]uilding out manufacturing facility ***to begin production in 2019***."  (Trenda Decl. Ex. 19 (Shane Archer LinkedIn (emphasis added)).)  Specifically, Defendants' wrongdoing has decreased the value of Javo and directly interfered with recent efforts to sell the company, and it will continue to do so if CEV is not stopped from unfairly competing.  (Anderson Decl. ¶¶ 19–22; Riley Decl. ¶ 14.)  "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).  In the trade secret context, "an intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost always certainly show irreparable harm." *Sun Distrib. Co.*, 2018 WL 4951966, at \*7; *see also Pixon Imaging, Inc. v. Empower Techs. Corp.*, 2011 WL 3739529, at \*6 n.7 (S.D. Cal. Aug. 24, 2011) (same).  Courts in other districts have reached the same conclusion.  *See, e.g., W. Directories, Inc. v. Golden Guide Directories, Inc.*, 2009 WL 1625945, at \*6 (N.D. Cal. June 8, 2009) ("The Court presumes that Plaintiff will suffer irreparable harm if its proprietary information is misappropriated."); *Gallagher Benefits Servs., Inc. v. De La*

---

[12] Alternatively, the residuary four-year limitation period for all causes of action that do not fall under specific statutes of limitations applies.  Cal. Civ. Proc. Code § 343.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

23.

JAVO'S MEM. I/S/O MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. 19-CV-1859 CAB WVG

*Torre*, 2007 WL 4106821, at *5 (N.D. Cal. Nov. 16, 2007) (same), *aff'd in relevant part*, 283 F. App'x 543 (9th Cir. 2008); *Pac. Aerospace & Elecs., Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1198 (E.D. Wash. 2003) (same); *Advanced Instructional Sys., Inc. v. Competentum USA, Ltd.*, 2015 7575925, at *4 (M.D. N.C. Nov. 25, 2015) (same).

Javo has built its entire business around its proprietary extraction process. Javo will suffer irreparable harm if a competitor like CEV is permitted to wrongfully take and misuse Javo's proprietary information to manufacture competing products. *Henry Schein, Inc.*, 191 F. Supp. 3d at 1077 ("[E]vidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."); *Extreme Reach, Inc. v. Spotgenie Partners, LLC*, 2013 WL 12081182, at *7 (C.D. Cal. Nov. 22, 2013) (same). There is also a risk of further evisceration of Javo's trade secrets through additional disclosure by Defendants—whether through additional patent filings or pitches to investors. Indeed, Defendants have already proven this risk. After Javo sent Defendants a cease-and-desist letter on May 30, 2019 (Riley Decl. Ex. 9), Defendants defiantly filed two additional patent applications in July 2019. (Trenda Decl. ¶ 7 (Patent App. No. 16/520,230 (filed July 23, 2019); Patent App. No. 16/460,847 (filed July 2, 2019).) Defendants have interfered with the sale of Javo and now threaten to unfairly compete by entering the market with products that CEV has manufactured using Javo's stolen proprietary technology. There is nothing speculative about the irreparable harm Defendants will continue to cause Javo. As Corey agreed in his EA and CIAA, any breach of the agreements relating to Javo's trade secrets and other confidential information is likely to cause irreparable harm, such that Javo should be entitled to injunctive relief. (Doc. No. 1-2 at 11 (EA § 7.6); *id.* at 21 (CIAA § 11).)

### C. The Balance of Equities Favors the Requested Injunction.

"The balance of hardships tips heavily in favor of granting relief when an injunction merely prohibits Defendant[] from misappropriating the trade secrets." *Bemis Co. v. Summers*, 2019 WL 1004853, at *4 (E.D. Cal. Feb. 28, 2019); *see also Henry Schein, Inc.*, 191 F. Supp. 3d at 1077 ("[B]alance of hardships tips in favor of

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

24.

JAVO'S MEM. I/S/O MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. 19-CV-1859 CAB WVG

plaintiff seeking injunction when it would do no more than require Defendant to comply with federal and state laws.").  While it appears that CEV is only in the final stages of building out its extraction facility, it is clear that CEV (and Corey/Toneys) intend to continue infringing on Javo's proprietary process by unfairly competing and bringing to market a product based on Javo's trade secrets.  (*See supra* II(D)(2).)  Permitting Defendants' continued evisceration of Javo's trade secrets and other confidential information will irreparably damage Javo and prevent any future potential sale of the company.  The balance of equities favors Javo's request for injunctive relief.

**D.    The Public Interest Favors the Requested Injunction.**

It is well established that "[t]he public interest is served when [a] defendant is asked to do no more than abide by trade laws and the obligations of contractual agreements signed with [his] employer. Public interest is also served by enabling the protection of trade secrets." *Sun Distrib. Co.,*  2018 WL 4951966, at *8; *Softketeers, Inc.*, 2019 WL 4418819, at *10 (same); *Extreme Reach*, 2013 WL 12081182, at *9 (same).  Javo seeks only to require Defendants to abide by the law and Corey's contractual obligations, and to refrain from misappropriating Javo's trade secrets.  The public interest supports an injunction.

**V.    CONCLUSION**

Defendants Corey and CEV have deliberately stolen and publicly disclosed Javo's trade secrets and other confidential information and now plan to produce a competing product using Javo's process.  Javo's request for preliminary injunctive relief is both necessary and reasonably tailored to prevent further irreparable harm to Javo.  As detailed in the Motion for Expedited discovery (which Javo intends to file), Javo respectfully requests expedited discovery and respectfully reserves the right to expand the scope of requested injunctive relief based on any newly discovered information.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

25.

JAVO'S MEM. I/S/O MOTION
FOR PRELIMINARY INJUNCTION
CASE NO. 19-CV-1859 CAB WVG

1   Dated:    November 14, 2019          COOLEY LLP

2

3                                        By: */s/ Steven M. Strauss*
                                              Steven M. Strauss (99153)

4                                        Attorneys for Plaintiff Javo Beverage Co.,
                                         Inc.

5

6   214050100

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

26.