| | |
|---|---|
| 1 | COOLEY LLP |
| 2 | Steven M. Strauss (99153) (sms@cooley.com)<br>Erin C. Trenda (277155) (etrenda@cooley.com) |
| 3 | Alexander R. Miller (294474) (amiller@cooley.com)<br>4401 Eastgate Mall |
| 4 | San Diego, CA 92121<br>Telephone: (858) 550-6000 |
| 5 | Facsimile:  (858) 550-6420 |
| 6 | Jeffrey Karr (186372) (jkarr@cooley.com)<br>3175 Hanover Street |
| 7 | Palo Alto, CA 94304<br>Telephone: (650) 843-5000 |
| 8 | Facsimile: (650) 849-7400 |
| 9 | Attorneys for Plaintiff<br>Javo Beverage Co., Inc. |

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JAVO BEVERAGE CO., INC.,<br><br>Plaintiff,<br><br>v.<br><br>CALIFORNIA EXTRACTION VENTURES, INC. AND STEPHEN COREY,<br><br>Defendants. | Case No.  19-cv-1859 CAB WVG<br><br>**DECLARATION OF GERRY ANDERSON ISO JAVO'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>**HIGHLY CONFIDENTIAL**<br><br>Date:    December 19, 2019<br>Ctrm.:   4C (4th Floor)<br>Judge:  Hon. Cathy Ann Bencivengo<br><br>Complaint Filed: September 26, 2019<br>Trial Date:           TBD<br><br>**[REDACTED - FILED UNDER SEAL]** |

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

HIGHLY CONFIDENTIAL               1.                    **DECLARATION OF G. ANDERSON ISO**
**JAVO'S MOT. FOR PRELIM. INJUNCTION**
**CASE NO. 19-CV-1859 CAB WVG**

I, Gerry Anderson, declare as follows:

1. I am the Chief Financial Officer for Plaintiff Javo Beverage Co., Inc. ("Javo"). I originally joined Javo as a consultant in January 2014, and became CFO on April 1, 2014. I submit this declaration in support of Javo's Motion for Preliminary Injunction. I have personal knowledge of the matters set forth in this declaration and could and would testify competently thereto.

2. Javo is an extractor of coffee, teas, and botanicals in Vista, California, where our corporate offices and original extraction facility are located. We also have a second manufacturing facility in Indianapolis, Indiana, that we opened in 2018. Javo has always used a cold extraction process, but our product offerings have evolved over time. Javo's original base of business was bag-in-a-box coffee extract for hot coffee and iced latte dispensed applications. The significant growth vehicle for Javo over the last few years has been extractions for cold brew coffee, tea and botanical beverages.

3. From an early stage, Javo elected to rely on trade secret protection to protect its proprietary processes. I am aware that this decision was made by prior management, after they concluded patent protection would have required disclosing Javo's confidential processes and would have been challenging to enforce given the difficulty in determining if an end product was manufactured using a process that infringed on Javo's process. During my tenure at Javo, the decision to continue to rely on trade secret protection was discussed and reaffirmed by both management and the board of directors for these same reasons.

4. One of Javo's primary means of protecting its trade secrets and other confidential information has been to have the company's employees and contractors execute strict confidentiality agreements and invention assignment agreements in favor of the company.

5. A true and correct copy of the Employment Agreement ("EA") and Employee Confidentiality and Invention Assignment Agreement ("CIAA") that Stephen Corey ("Corey") signed on December 5, 2001, as well as the release that Corey

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

HIGHLY CONFIDENTIAL                    2.

DECLARATION OF G. ANDERSON ISO
JAVO'S MOT. FOR PRELIM. INJUNCTION
CASE NO. 19-CV-1859 CAB WVG

1  signed following his termination on December 12, 2011, was previously filed by Javo
2  in this case at Doc. No. 1-2.

3      6.   Corey was an employee of Javo and its predecessor entities from inception
4  around 1993 until August 2011. It was always my understanding that Corey's departure
5  from Javo occurred in connection with the bankruptcy restructuring and was not
6  contentious. Based on my review of Javo business records, I have confirmed that after
7  Corey's termination, Javo paid Corey a one-year severance of ▮▮▮▮▮ under the EA.
8  In addition to the release that Corey signed under the EA, Corey never raised any claims
9  against Javo during the bankruptcy process.

10     7.   After the bankruptcy in 2011, Javo emerged as a privately-held company.
11 Javo's current ownership is comprised primarily of two private holding companies,
12 Coffee Holdings LLC and Coffee Holdings Add-On, LLC, which are affiliates of the
13 private equity firm Falconhead Capital, as well as six minority shareholders that hold
14 1.1% of the outstanding common shares.

15     8.   Over the past five years, Javo has ▮▮▮▮▮ its business. During the
16 initial three years following Javo's exit from bankruptcy, it rebuilt customer
17 relationships with its original business base, resulting in organic growth in the range of
18 ▮▮▮▮▮ Once cold brew coffee became popular in 2016 and 2017, Javo's growth
19 skyrocketed and our production volumes ▮▮▮▮▮. Javo was well-positioned
20 for the cold brew boom because Javo's proprietary extraction process yields an
21 authentic cold brew flavor at high levels of concentration—attributes that are
22 unmatched by other coffee extractors.

23     9.   For example, after the 2011 bankruptcy, Javo's annual production volume
24 hovered around ▮▮▮▮▮ of ▮▮ extract, with annual net revenue
25 of between ▮▮▮▮▮. In 2015, Javo won a major account and as its extraction
26 volumes grew, net revenue increased to ▮▮▮▮▮. With the cold brew
27 phenomenon, Javo's production volumes skyrocketed and its annual revenue jumped
28 from ▮▮▮▮▮ in 2016, to ▮▮▮▮▮ in 2017, and ▮▮▮▮▮ in 2018. This

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

HIGHLY CONFIDENTIAL                     3.                DECLARATION OF G. ANDERSON ISO
                                                          JAVO'S MOT. FOR PRELIM. INJUNCTION
                                                          CASE NO. 19-CV-1859 CAB WVG

1  past year, Javo produced roughly ▮▮▮▮▮▮▮▮ of extract and generated
2  approximately ▮▮▮▮▮▮▮▮.

3  10. In response to this growth, Javo opened its second production facility in
4  Indianapolis in 2018. The second facility serves three purposes: (1) increasing capacity
5  to meet demand; (2) ensuring reliability and redundancy in production, which is a
6  requirement of a number of Javo's national accounts; and (3) providing a more central
7  U.S. location that enables distribution savings for its accounts in the Midwest and East
8  Coast.

9  11. After Javo's second production facility in Indianapolis became
10 operational, Javo was well positioned to sell the company, ideally to a national or global
11 strategic acquiror who would be attracted to and could enhance Javo's growth potential.
12 Javo's proprietary extraction process had successfully scaled to meet increased
13 customer demand while maintaining the same flavor quality and high concentration
14 level ▮▮▮▮ Javo's value as a company has been driven by Javo's proprietary
15 extraction process, which demonstrably sets Javo apart from its competitors.

16 12. In late August or early September 2018, Javo retained Houlihan Lokey as
17 the investment bankers to market Javo to potential acquirors. In the fourth quarter of
18 2018 and early first quarter of 2019, third parties were approached about the potential
19 sale of Javo. The potential acquirors fell into three categories: (1) beverage; (2)
20 ingredient; and (3) financial buyers.

21 13. I attended weekly update calls with Houlihan Lokey and Falconhead
22 Capital, and I am generally familiar with the process that occurred. I was also the
23 primary point person at Javo for the due diligence that was performed by potential
24 acquirors.

25 14. In December 2018, Javo management made some early presentations to a
26 few potential acquirors to get a sense of the market and potential bid price.

27 15. In late February 2019, deal books were distributed to roughly ▮▮▮▮▮.
28 From approximately ▮▮▮▮▮▮▮▮, I believe that ▮▮▮▮ submitted letters of

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

HIGHLY CONFIDENTIAL                 4.                 DECLARATION OF G. ANDERSON ISO
JAVO'S MOT. FOR PRELIM. INJUNCTION
CASE NO. 19-CV-1859 CAB WVG

interest.

16. Javo and its advisors then narrowed that list down and gave management presentations to ▇▇▇▇. After management presentations, ▇▇▇▇ emerged as potential acquirors and each began to perform significant due diligence on Javo.

17. It was evident throughout the bidding process that Javo's proprietary extraction process was of particular interest to the potential acquirors that emerged. This is consistent with Javo's process being a unique process in the industry and a key driver of Javo's success. Customers have told us that they seek out Javo for the quality of our extract, which is more flavorful, smoother, has a true cold brew taste, and offers a higher concentration than our competitors' products. Several of the potential acquirors ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, and therefore knew firsthand of Javo's unique quality advantage.

18. During the due diligence process, Javo started getting very detailed questions from ▇▇▇▇▇▇▇▇ about Javo's proprietary process. I recall that we began to receive these questions over the weekend of May 11, 2019. When the questions were initially asked, we had real concerns about the level of detail being requested and how much of Javo's proprietary process we were comfortable sharing with ▇▇▇▇▇▇▇▇ given we were still in serious discussions with ▇▇▇▇▇▇▇▇ at the time.

19. At some point in the exchange, we learned that Corey/California Extraction Ventures, Inc. ("CEV") had filed patents and patent applications that ▇▇ ▇▇▇▇▇▇ thought sounded a lot like Javo's process. After we learned of the patents, we felt obligated to inform the ▇▇▇▇▇▇▇▇ about the patent family and the apparent breach by Corey of the EA and CIAA.

20. Consistent with Javo's proprietary process being of interest to potential acquirors, the potential sale process eventually fell apart due to the discovery of the patents filed by Corey/CEV. Shortly after Javo discovered the patents, ▇▇

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

HIGHLY CONFIDENTIAL                    5.                    DECLARATION OF G. ANDERSON ISO
                                                             JAVO'S MOT. FOR PRELIM. INJUNCTION
                                                             CASE NO. 19-CV-1859 CAB WVG

1 ████████████████████████████████████████
2 ████████████████████████████████████████
3 ████████████████████████████████████████
4 ████████████████████████████████████████
5 ████████████████████████████████████████
6 ████████████████████████████████████████
7 ████████████████████████████████████████
8 ████

21. Javo estimates that Corey and CEV have caused the company damages in excess of $50 million, including the reduction in bid price from potential acquirors, less advantageous deal terms, additional time and money spent on negotiations, and the ultimate termination of the sale process.

22. I vividly remember the reaction that I had when we discovered the patents filed by Corey/CEV—a reaction that was shared by Javo President and CEO, Dennis Riley, and Javo VP of Operations, Brad Petersmeyer. We were all shocked to discover that Corey had been filing for patents and had assigned them to a new company, CEV. Prior to this discovery, we had no reason to think Corey was in breach of his EA and CIAA, let alone that he was filing patents on Javo's proprietary and confidential extraction process. Before discovering the patent filings in May 2019, we had never heard of CEV.

23. Consistent with Javo's decision to protect its proprietary extraction process as a trade secret, Javo has not applied for and does not own any patents. Prior to discovering the patents filed by Corey/CEV during the due diligence process, Javo was not aware of any competitors attempting to patent similar technology to Javo's process. Javo had no reason to be monitoring USPTO records, and we did not know that Corey was filing patent applications until we learned of the Corey/CEV patents and patent applications in May 2019.

24. Shortly after we learned of the patents, Dennis Riley sent a letter to Corey

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

HIGHLY CONFIDENTIAL       6.       DECLARATION OF G. ANDERSON ISO
JAVO'S MOT. FOR PRELIM. INJUNCTION
CASE NO. 19-CV-1859 CAB WVG

and CEV on May 30, 2019. The letter demanded that Corey and CEV cease and desist from any further use or disclosure of Javo's confidential information and trade secrets, including the further development or sales of products related to the confidential information and trade secrets.

25. Additional correspondence and meetings with Corey/CEV's legal counsel took place from June 2019 through late September 2019.

26. Despite Corey/CEV receiving Javo's letter and engaging in discussions, we later learned that Corey/CEV continued to file at least two patent applications in July 2019.

27. After, it became clear to Javo that Corey and CEV did not intend to resolve this dispute in good faith, Javo filed this lawsuit against CEV and Corey for trade secret misappropriation, as well as additional claims against CEV.

28. Javo has also filed an arbitration demand against Corey for breach of his contractual obligations and the covenant of good faith and fair dealing.

29. Since filing the lawsuit, we have tried to get additional information concerning our suspicion that CEV intends to manufacture a competing product using Javo's proprietary extraction process.

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 8, 2019, in Vista, California.

*Gerry Anderson*
Gerry Anderson

213333136

Cooley LLP
Attorneys At Law
San Diego

HIGHLY CONFIDENTIAL

7.

DECLARATION OF G. ANDERSON ISO
JAVO'S MOT. FOR PRELIM. INJUNCTION
CASE NO. 19-CV-1859 CAB WVG